IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 552-1 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| FERNANDO QUINTANA | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Fernando Quintana ("Defendant") has moved to suppress all evidence, and fruits obtained therefrom, resulting from the warrantless detention and search of his person, belongings, and vehicle on September 10, 2015, as well as from the search of his residence later that day, on the grounds that the government obtained such evidence in violation of his Fourth Amendment right to be secure from unreasonable searches and seizures under the United States Constitution. (R.35). For the reasons stated below, the Court denies Defendant's motion to suppress with respect to his arrest and the search of his vehicle on September 10, 2015. The Court denies as moot Defendant's motion to suppress with respect to the search of his residence, given the government's representation that it does not intend to introduce any evidence resulting from said search. (R.36, Response Br. at 15).

## BACKGROUND

On October 8, 2015, a grand jury returned a one-count Indictment (the "Indictment") against Defendant (aka "Carlos"). (R.8). The Indictment charged Defendant with knowingly and intentionally possessing with the intent to distribute a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). (*Id.*).

**ANALYSIS**

Defendant asks the Court to suppress the physical evidence—namely, a plastic bag containing five brick-shaped packages containing approximately 6.34 kilograms of heroin—that the government obtained from his vehicle on September 10, 2015, on the basis that the government—in arresting and searching Defendant without a warrant, and simultaneously searching his vehicle without a warrant—violated his Fourth Amendment rights. (R.35, Opening Br. at ¶¶ 1-4). In addition, Defendant asks the Court to suppress the "incriminating responses" that he allegedly provided during the course of his arrest and transportation to a law enforcement facility, on the grounds that the predicate arrest was unconstitutional. (*Id.* ¶ 5).

**I.    Legal Standard**

"The Fourth Amendment protects citizens against unreasonable searches and seizures." *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013); *see also* U.S. Const. amend. IV. "The jurisprudence of the Supreme Court makes clear that the primary bulwark against such conduct is the procurement of a warrant from a neutral and detached magistrate." *United States v. Whitaker*, 546 F.3d 902, 906 (7th Cir. 2008) (citing *Groh v. Ramirez*, 540 U.S. 551, 575, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004)). Accordingly, "[a] warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)). Indeed, if law enforcement officials conduct a warrantless search, "the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *Id.* (citing *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)).

A criminal defendant seeking to suppress evidence, however, "bears the burden of making a prima facie showing of illegality." *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). A defendant "bears the burden of both identifying a definite disputed factual issue, and demonstrating its materiality" in order to warrant an evidentiary hearing on a suppression motion. *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion").

## II.   The Investigation and Subsequent Arrest

### A.   Underlying Investigation

In August 2015, a Drug Enforcement Agency ("DEA") source informed DEA agents that an individual known as "Pedro" was seeking heroin customers in the Chicago area. The source provided the phone number for "Pedro." On August 24, 2015, a female undercover agent ("UC-2") called that number and spoke in Spanish to a man who responded to the name "Pedro." After noting that she was interested in purchasing "something" and that she was in Chicago, "Pedro" stated that he was in Austin, Texas. UC-2 placed this call from a phone belonging to a male undercover agent, Ronald Coleman ("Coleman"), posing as Coleman's girlfriend. The government does not intend to call Coleman as a witness, or rely on his statements in this case.

On August 26, 2016, a telephone number ending in -1518 (the "1518 Number") texted Coleman's phone, stating "Wus up dalu toll me to call u to see if u wona work."[1] Later that day, Coleman spoke with the user of the 1518 Number, noting that "he [Pedro] said he's in Austin" and asking, "Are you guys up here in Chicago?" The 1518 Number user responded, "We're close." They agreed to talk the next day.

---

[1] Law enforcement officers other than Coleman recorded and logged into evidence all calls and texts between Coleman's phone and the 1518 Number.

3

Over the next two days, Coleman exchanged a series of text messages and telephone calls with the user of the 1518 Number, who identified himself as "Carlos." Coleman and "Carlos" arranged to meet, and did meet, at a shopping mall in Oak Brook, Illinois, on August 28, 2015. Coleman recorded the meeting via body wire, and a surveillance team observed the meeting. The voice of "Carlos," recorded on Coleman's body wire, matched that of the user of the 1518 Number.[2] Although the exact identity of "Carlos" was not known to the surveillance officers at this time, the officers later identified him as Defendant, after Defendant provided his driver's license to an Aurora Police Department officer during a traffic stop.

On August 29, 2015, "Carlos" texted Coleman, asking "r u want to test drive a car today or monday?" Coleman's response text stated, "sometime Monday is good . . . what's the test drive going for?" Coleman followed up the next day, texting, "So let's discuss car and price bro." Coleman and "Carlos" then exchanged texts and call, coordinating to meet on September 2, 2015, in the "same place," "by the bench."

On September 2, 2015, Coleman and "Carlos" met again. Coleman recorded the meeting via body wire, while a surveillance team observed. In particular, "[l]aw enforcement officers observed Coleman meet with [Defendant] and return with approximately 2 grams of a brown substance that tested positive for the presence of heroin." (R.36, Response Br. at 3).

Between September 2 and September 8, 2015, Coleman and "Carlos" exchanged a series of texts and calls about "cars." On September 4, for example, "Carlos" texted Coleman, "we just got 15 cars from auto action they r from other states so there in good conditions no rusty at all they gonna go fast." On September 6, "Carlos" responded "Yes" in response to Coleman's text message, "Just checking the cars will drive nice like the test drive." During a phone

---

[2] The government has represented that the voice also matched that of Defendant, after his arrest. (R.36, Response Br. at 2 n.3).

4

conversation that day, moreover, "Carlos" referenced his "manager" and asked Coleman, "so you're planning to come and get five cars?" Coleman and "Carlos" arranged to meet on September 9, 2015, this time in the parking lot of a restaurant in Downers Grove, Illinois.

On September 9, 2015, Coleman and "Carlos" met again. Coleman recorded the meeting via body wire, while a surveillance team observed. In particular, law enforcement officers observed "[Defendant] arrive in a vehicle, exit his vehicle, and enter the passenger seat of a vehicle driven by Coleman. [Defendant] remained in Coleman's vehicle for approximately 15 minutes, then returned to his vehicle and departed." (R.36, Response Br. at 4). That day, DEA Chicago Field Division ("CFD") Enforcement Group 38 "met and formulated a plan for an undercover operation to occur on September 10, 2015." (R.36-5, DEA Narrative Report at ¶ 1).

On September 10, 2015, "Carlos" texted Coleman, "see you at work." At approximately 6:45AM, members of Enforcement Group 38 established surveillance near "1715 Ravine Park Lane" in Aurora, Illinois—an area "previously identified as the residence of Fernando Quintana"—in anticipation of a meeting between Defendant and Coleman. (R.36-5, DEA Narrative Report at ¶ 2). Around 11:05AM, Special Agent Dave Brazao observed Defendant exit the residence wearing "a tank top, sunglasses and shorts" and walking a dog. (*Id.* ¶ 3). Around 11:51AM, "Carlos" called Coleman, informing Coleman that his car had broken down and that he would be arriving in a white Honda. At approximately 11:53AM, "surveillance was advised that [Defendant] would arrive in a white Honda to the meeting" with Coleman. (*Id.* ¶ 4). Some units maintained surveillance at the residence, while others relocated to the "UC meeting location at 1450 Butterfield Road, Downers Grove, IL." (*Id.*).

At approximately 12:15PM, Special Agent Emilia Fernandez observed Defendant sitting in a white Honda Civic in a parking lot near 1450 Butterfield Road. (*Id.* ¶ 5). Ten minutes later,

5

Special Agent John Buonincontro observed the white Honda relocate to a parking lot at 1556 Butterfield Road, parking in front of a store. Buonincontro identified Defendant as he exited the vehicle and entered the store. (*Id.* ¶ 6). At approximately 12:40PM, Special Agents Brazao and Buonincontro observed Defendant exit the store, enter the white Honda, and relocate to a parking lot across the street, at 2958 South Finley Road. (*Id.* ¶ 7). At some point during this window of time, "Carlos" and Coleman again spoke on the phone. "Carlos" informed Coleman that he had moved across the street from their previous meeting location because he had seen a security guard. Surveillance video from September 10, 2015—portions of which the Court has reviewed in connection with this motion—confirms this sequence of events. (R.36-1, Surveillance Video at 20:25-21:30; 25:07-48; 26:30-28:48). In particular, relevant portions of the video feed show a man (i) exiting the driver's side of a white Honda, wearing a tank top and shorts; (ii) entering a store; (iii) minutes later, exiting the store and returning to the white Honda; and (iv) driving to a parking lot across the street. (*Id.*).

At approximately 12:50PM, Special Agents Brazao and Buonincontro witnessed Coleman drive into the parking lot on Finley Road. Coleman parked near the white Honda, on its passenger side. (R.36-5, DEA Narrative Report at ¶ 8; R.36-1, Surveillance Video at 33:17-32). The front passenger window of the white Honda opened. (R.36-1, Surveillance Video at 33:32-37). Coleman exited his vehicle and looked inside the white Honda through the open window. (*Id.* at 33:40-49). Coleman then "gave a pre-arranged signal," indicating that the other law enforcement officers should move in for an arrest. (*Id.* at 33:50-55; R.36-5, DEA Narrative Report at ¶ 8).

### B. The September 10, 2015 Arrest and Vehicle Search

After Coleman's signal, two law enforcement vehicles boxed in the white Honda. One struck Defendant's rear bumper. Law enforcement agents exited the vehicles, and at least one brandished a weapon at Defendant. (R.36-1, Surveillance Video at 34:00-06). Agents removed Defendant from his vehicle, searched him, and arrested him. The government does not dispute that this constituted a "seizure" within the meaning of the Fourth Amendment. (R.36, Response Br. at 7).

Simultaneous with this arrest, Special Agent Kevin Miller "seized approximately 5 kilograms of heroin" from the passenger seat of Defendant's vehicle, as well as packaging material and a cell phone. (R.36-5, DEA Narrative Report at ¶ 8; R.35-1 and R.36-2, photographs).

At approximately 1:10PM, agents read Defendant his Miranda rights. Defendant acknowledged his rights and declined to answer questions. (R.36-5, DEA Narrative Report at ¶ 9). Agents, including Special Agent Brazao, then transported Defendant to a law enforcement facility for processing. (*Id.* ¶ 10). After processing, Defendant told agents that the white Honda belonged to a friend, and that the only items in the vehicle belonging to him were a dog, a leash, and some dog food. (*Id.*).[3]

### III. Law Enforcement Did Not Violate Defendant's Fourth Amendment Rights

The Court now turns to the relevant Fourth Amendment inquiry at issue – whether law enforcement's warrantless arrest of Defendant and warrantless search of Defendant's vehicle was unreasonable and, as a result, unconstitutional. The Court assesses both in turn.

---

[3] Subsequent to the arrest, law enforcement officers and agents conducted a search at Defendant's residence. (R.36-4, DEA Narrative Report at ¶¶ 1-2). Given the government's representation that it does not seek to introduce any evidence obtained from this search, however, the Court does not examine the facts underlying this search.

### A. The Arrest

It is well-settled that "searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona*, 556 U.S. at 338 (citation omitted). One exception to the warrant requirement for an arrest is when law enforcement has "probable cause to believe that a suspect has committed, is committing, or is about to commit an offense." *United States v. Slone*, 636 F.3d 845, 848 (7th Cir. 2011); *see also United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009) ("police may arrest an individual if they have probable cause to believe that the individual engaged in criminal conduct, as an arrest supported by probable cause is reasonable by its very nature") (citation omitted). Probable cause "means that there are facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Slone*, 636 F.3d at 849 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). This assessment is a "totality of the circumstances" determination, and "officers are entitled to draw reasonable inferences based on their training and experience in making that determination." *See United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996); *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010).

Here, the totality of the facts and circumstances were sufficient to create probable cause for Defendant's September 10, 2015 arrest. In particular, Coleman and "Carlos" exchanged a series of recorded texts and calls in late August and early September 2015—all stemming from UC-2's initial inquiry with an identified heroin supplier—to discuss the purchase of "cars." Although Defendant argues that these conversations "consisted merely of vague references to the

defendant's ostensibly innocent activities [*i.e*, selling used cars]," (R.37, Reply Br. at 8), the officers were entitled to draw upon their narcotics training and experience to conclude that "Carlos" was engaged in drug trafficking. This is especially true considering that, after Coleman met with "Carlos" on September 2, 2015 to "test drive a car," Coleman returned with 2 grams of heroin. *See United States v. Scott*, 19 F.3d 1238, 1242 (7th Cir. 1994) ("In other words, taken in isolation, various specific pieces of evidence implicating Scott might be innocently explained away. But the police, properly, viewed his conduct as a whole. Doing so, they had probable cause to conclude that Scott was trafficking in illegal drugs"); *Williams*, 627 F.3d at 252 (noting the same). After this meeting, "Carlos" and Coleman continued to discuss the purchase of "cars," and arranged to meet in person on September 10, 2015. On September 10, "Carlos" informed Coleman that he would arrive in a white Honda. After arriving at one parking lot, he switched to another, informing Coleman that he had seen a security guard. Finally, after seeing Coleman pull up next to him, "Carlos" opened the passenger side window of the white Honda. Given these circumstances—that is, (i) the recorded calls, texts, and meetings between "Carlos" and Coleman between August 26 and September 9, 2015, and the use of consistent, coded references throughout; (ii) the narcotics exchange on September 2, 2015; (iii) the evasive conduct immediately preceding the September 10, 2015 meeting; and (iv) the opening of the vehicle window upon seeing Coleman—law enforcement had probable cause to arrest Defendant on the belief that he was "about to commit an offense" involving narcotics. *Slone*, 636 F.3d at 848.

Defendant's argument to the contrary is unpersuasive. In particular, Defendant argues that—absent the testimony of Coleman—there is insufficient probable cause to link Defendant to the narcotics exchange on September 2, 2015 and/or to the white Honda on September 10, 2015.

9

As Defendant acknowledges, however, other agents surveilled Defendant's activities since the initial meeting between "Carlos" and Coleman on August 28, 2015. Agents later surveilled the narcotics exchange on September 2, 2015, and the meetings between Coleman and "Carlos" on September 9 and September 10, 2015. Although Defendant queries whether any of the arresting agents "had ever seen the defendant in person" prior to his arrest, (R.37, Reply Br. at 4-5), the DEA Narrative Report indicates that they had. In particular, it notes that, on September 9, 2015, members of DEA CFD Enforcement Group 38 "met and formulated a plan for an undercover operation to occur on September 10, 2015." (R.36-5, DEA Narrative Report at ¶ 1). The next morning, the team established surveillance near "1715 Ravine Park Lane" in Aurora, Illinois—an area "previously identified as the residence of Fernando Quintana." (*Id.* ¶ 2). This notation, in particular, indicates that—at least by the morning of September 10, 2015—agents had already positively identified Defendant as "Carlos," whose voice—previously recorded via Coleman's body wire—matched that of the user of the 1518 Number. Around 11:05AM, Special Agent Brazao observed Defendant exit his residence with a dog. (*Id.* ¶ 3). At approximately 11:53AM, "surveillance was advised that [Defendant] would arrive in a white Honda to the meeting" with Coleman. (*Id.* ¶ 4). Special Agent Brazao relocated, and, around 12:40PM, observed Defendant exit a store, enter a white Honda, and drive to a parking lot at 2958 South Finley Road. (*Id.* ¶ 7). Special Agent Buonincontro also identified Defendant in the parking lot of 1556 Butterfield Road, before he relocated to Finley Road in a white Honda. (*Id.* ¶¶ 6-7). These pre-arrest identifications by agents other than Coleman undercut Defendant's theory that the agents "arrested the unidentified driver of a lawfully parked automobile, without first making a positive identification that the target of their investigation (the defendant) was the person inside." (R.37, Reply Br. at 2). Defendant offers no record support, moreover, for his contention that "the

10

range, distance, vantage point, and limited duration" of these observations "did not allow for a meaningful positive identification of the driver of the white Honda." (*Id.* at 4). *See Curlin*, 638 F.3d at 564 (to warrant an evidentiary hearing, "the defendant's allegations and moving papers must be sufficiently definite, specific, non-conjectural and detailed") (citation and quotation omitted).

Even if these particular agents had not made a positive pre-arrest identification of Defendant, moreover, the record reflects that Coleman *had*, given their numerous prior meetings, including the September 2, 2015 narcotics exchange. Other law enforcement agents observed, listened to, and were familiar with these meetings. In light of the government's representations concerning (i) how Coleman's phone records were logged, and (ii) how surveillance agents were involved at each step of the criminal investigation, the Court is satisfied that the government will be able to establish a factual foundation to support Coleman's arrest signal, even absent Coleman's direct testimony in this case. *See Williams*, 627 F.3d at 255 ("The knowledge of a team of officers working together closely in monitoring a drug transaction as it unfolds . . . may be mutually imputed even the absence of express testimony that the specific or detailed information creating the justification for the stop was conveyed. Therefore, knowledge of the information contained in the intercepted phone calls can be imputed to Gutierrez based on his role in the task force's investigation") (citations and quotations omitted).

Given Defendant's failure to identify a disputed issue of material fact concerning his arrest, the Court denies his request to hold an evidentiary hearing on such topic. *See Curlin*, 638 F.3d at 564. In view of the totality of circumstances present in this case, the Court concludes that law enforcement's September 10, 2015 arrest of Defendant did not violate Defendant's Fourth Amendment rights. *See Williams*, 627 F.3d at 251; *Slone*, 636 F.3d at 848-49.

11

## B. The Vehicle Search

The Court next turns to the search of the white Honda. Although "[a] warrantless search is per se unreasonable under the Fourth Amendment," there do exist "a few well-established exceptions." *Zahursky*, 580 F.3d at 521 (citing *Arizona*, 556 U.S. at 338). One example is the "automobile exception." *See United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). This exception provides that "a warrantless search of a vehicle is constitutionally permissible if police have probable cause to believe the vehicle contains contraband or other evidence of illegal activity." *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (citing *Edwards*, 769 F.3d at 514). "Probable cause to search a vehicle exists when, based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (citation and quotation omitted); *see also Edwards*, 69 F.3d at 514 ("Probable cause exists when[,] based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched") (citation omitted).

Here, the same totality of circumstances justifying law enforcement's warrantless arrest of Defendant also justified law enforcement's warrantless search of the white Honda. In other words, law enforcement had probable cause to believe that the white Honda contained contraband, given (i) the prior conversations and meetings between Coleman and "Carlos" to purchase "cars," including the September 2, 2015 narcotics exchange as a "test drive;" (ii) their recorded arrangement to meet on September 10, 2015, following a meeting on September 9, 2015; (iii) the September 10, 2015 communication from "Carlos" to Coleman that he would arrive in a white Honda to the prearranged meeting spot; (iv) Defendant's evasive conduct preceding their meeting, relocating to another parking lot on the communicated belief that he had

seen a security guard; and (v) the opening of the white Honda's passenger-side window upon seeing Coleman's car parked nearby. These circumstances, viewed as a whole, support a finding of probable cause to search the white Honda. *See Williams*, 627 F.3d at 252 ("a finding of probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime. All that is required is a fair probability of discovering contraband") (citations and quotations omitted). Although Defendant is correct that, by September 10, 2015, "there had already been at least two occasions when the two men met together in person without engaging in any narcotics transaction whatsoever," (R.37, Reply Br. at 8), "absolute certainty of such a [contraband] discovery is not required." *See Williams*, 627 F.3d at 251. Given Defendant's surveilled conduct in the weeks, days, and minutes leading up to his arrest, law enforcement officers had probable cause to search the white Honda for evidence of criminal activity on September 10, 2015, including probable cause to search the plastic shopping bag. *See id.* ("When probable cause exists to search a vehicle, law enforcement agents are permitted to search all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks").

Given Defendant's failure to identify a disputed issue of material fact bearing on this independent probable cause inquiry, the Court denies his request for an evidentiary hearing. *See Curlin*, 638 F.3d at 564. The Court concludes, in light of the totality of circumstances present here, that law enforcement's September 10, 2015 search of the white Honda did not violate Defendant's Fourth Amendment rights. *See Williams*, 627 F.3d at 251; *Sands*, 815 F.3d at 1063. Given this disposition, the Court does not reach the government's arguments concerning the "plain view" exception or the application of the "inevitable discovery" doctrine.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion to suppress. (R.35).

DATED: October 27, 2016

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge